# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ADVOCACY CENTER FOR PERSONS
WITH DISABILITIES, INC., BOBBY DIXON,
GROVIE DALSELL, TRACY FRIEDLAND, AND
MICHAEL HARRIS,**

        **Plaintiffs,**

**vs.**

**WOODLANDS ESTATES ASSOCIATION, INC.,
a Florida nonprofit corporation,**

        **Defendant.**

_____/

CASE NO. *8: 01 CV-1122-T-17*
*m AP*

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.     This is an action for a declaration of rights, injunctive relief, attorney fees and costs.

2.     Plaintiff, ADVOCACY CENTER FOR PERSONS WITH DISABILITIES, INC. ("Advocacy Center") is the designated Protection and Advocacy system for Florida and, inter alia, has standing to pursue the legal rights of individuals with developmental disabilities.

3.     Plaintiffs, DALZELL, DIXON, FRIEDLAND, and HARRIS, reside in a six bed group home located at 110 Arbor Lane in Pinellas County, Florida ("the property") that is owned by the Upper Pinellas Association for Retarded Citizens, Inc. ("UPARC"), a Florida not-for-profit corporation.

*T 106 22*
*$150.00*

4.      Defendant   WOODLANDS   ESTATES   ASSOCIATION   INC.'s ("Woodlands") conduct (as hereinafter alleged) has violated Plaintiffs' rights as secured by 42 U.S.C. § 3601 et seq. ("Fair Housing Act").

## JURISDICTION

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

6.      This Court has the authority under 28 U.S.C. §§ 2201 and 2202 to declare the rights and other legal relations of the parties to this action.

7.      This action arises under 42 U.S.C. § 3601 et seq.

## VENUE

8.      Venue is proper in this Court under to 28 U.S.C. § 1391 (b) because all events giving rise to this action occurred in this district.

## PARTIES

9.      The Plaintiff Advocacy Center is a private not-for-profit Florida Corporation designated by the Governor as Florida's Protection and Advocacy system.

10.      The Advocacy Center is authorized to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of . . ." individuals with developmental disabilities.  Developmental Disabilities Assistance and Bill of Rights Act of 2000,  Public Law 106-402, 114 Stat. 1677 (2000), Sec. 143(a)(2)(A)(i).

11.      Plaintiff, GROVIE DALSELL, is developmentally disabled as defined by § 393.063(12), Florida Statutes (2000), and, at relevant times herein, a resident in the UPARC home located at 110 Arbor Lane in Pinellas County, Florida.

12.      Plaintiff, BOBBY DIXON, is developmentally disabled as defined by

2

§ 393.063(12), Florida Statutes (2000), and, at relevant times herein, a resident in the UPARC home located at 110 Arbor Lane in Pinellas County, Florida.

13.     Plaintiff, TRACY FRIEDLAND, is developmentally disabled as defined by § 393.063(12), Florida Statutes (2000), and, at relevant times herein, a resident in the UPARC home located at 110 Arbor Lane in Pinellas County, Florida.

14.     Plaintiff, MICHAEL HARRIS, is developmentally disabled as defined by § 393.063(12), Florida Statutes (2000), and, at relevant times herein, a resident in the UPARC home located at 110 Arbor Lane in Pinellas County, Florida.

15.     The Defendant, a Florida not-for-profit corporation located in Pinellas County, Florida, is the homeowner's association for East Lake Woodlands Unit One wherein the property is located.

## FACTUAL ALLEGATIONS

16.     On or about December 1, 2000, UPARC purchased the property located at 110 Arbor Lane, Pinellas County, Florida that is subject to the Declaration of Covenants and Restrictions for East Lake Woodlands Unit One.

17.     The Arbor Lane property is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

18.     The property, at all relevant times herein, is used as a group home for six persons with developmental disabilities.

19.     On December 18, 2000, Woodlands sent UPARC a letter requesting that UPARC take no action in moving residents into the group home.  Woodlands claimed that UPARC's proposed use was in violation of Woodlands' Declaration of Covenants, Conditions and Restrictions, Section 2.01.  Additionally, Woodlands referenced Section

3

2.25 of the Declarations which states that "no illegal, noxious or offensive activity, nor shall anything be permitted or done thereon which is or may become a nuisance or a source of embarrassment, discomfort or annoyance to the neighborhood or Development." UPARC was advised the homeowners association was "concerned that the proposed use will create a nuisance." A copy of the December 18, 2000, letter is attached as Exhibit "A".

20.     In January 2001 Woodlands sued UPARC in state court to prevent the property from being used as a group home. A copy of the complaint is attached as Exhibit "B".

21.     The conduct of the Defendant described in the previous numbered paragraphs constitutes discrimination in violation of 42 U.S.C. § 3604(f)(1)

22.     On or about April 6, 2001, Plaintiffs, Dalzell, Dixon, Friedland, and Harris, requested that Woodlands grant a reasonable accommodation by not enforcing Section 2.01 of the Declarations against the 110 Arbor Lane property.

23.     Woodlands refuses to grant Plaintiffs' request.

24.     Woodlands' failure to grant a reasonable accommodation constitutes discrimination and violates 42 U.S.C. § 3604(f)(3)(B).

25.     Individuals with developmental disabilities, who are eligible for Advocacy Center services, have suffered an injury-in-fact to their legal rights because of Defendant's actions to enforce its restrictive covenants against their residence at 110 Arbor Lane.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court enter an ORDER that:

a.       Declares that the Defendant's discriminatory housing practices violate the

Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq.;

b.       Enjoins the Defendant from enforcing Section 2.01 of the Declaration of

Covenants and Restrictions for East Lake Woodlands Unit One against the

property;

c.       Awards costs and attorneys' to Plaintiffs;

d.       Grant such other relief as the Court may deem to be just and proper.

**DATED** this 8th of June, 2001.

ATTORNEYS FOR PLAINTIFF


GORDON B. SCOTT
Fla. Bar No. 112860
Trial Counsel

HUBERT A. GRISSOM
Flar. Bar No. 0166758
Trial Counsel

ADVOCACY CENTER FOR PERSONS
WITH DISABILITIES, INC.
2671 Executive Center Circle, West
Suite 100
Tallahassee, Florida 32301
Telephone:      850-488-9071
Facsimile:      850-488-8640

Dec-19-00  09:50    From-BROAD & CA    +    T-424   P.02   F-062



100 NORTH TAMPA
SUITE 3500
TAMPA, FLORIDA 33602
P.O. BOX 3310 (33601-3310)
TELEPHONE: 813.225.3020
FACSIMILE: 813.225.3039
www.broadandcassel.com

JONATHAN J. ELLIS, ESQUIRE
EMAIL: jellis@broadandcassel.com

December 18, 2000

**FEDERAL EXPRESS**

Upper Pinellas Association for
    Retarded Citizens, Inc.
c/o Thomas Buckley, Executive Director
1501 North Belcher Road
Clearwater, Florida 33765-1302

      RE:    Woodlands Estates Association, Inc. v. Upper Pinellas
              Association for Retarded Citizens

Dear Mr. Buckley:

    Please be advised that our firm has been retained by Woodlands Estates Association, Inc. f/k/a East Lake Improvement Association, Inc. ("Woodlands Estates") in the above-referenced matter. It has recently come to the attention of the Woodlands Estates' Board of Directors (the "Board") that the Upper Pinellas Association for Retarded Citizens, Inc. ("UPARC") is proposing a group home of six or fewer residents as defined pursuant to Section 419.001(2), Florida Statutes, on the parcel located at 110 Arbos Lane, Oldsmar, Pinellas County, Florida. The Woodlands Estates Board has recently reviewed this matter and believes the proposed use will violate the Woodlands Estates Declaration of Covenants, Conditions and Restrictions (OR Book 4330, Page 984) (the "Declarations"), copies of which are enclosed.

    The Board believes the proposed use is in conflict with the Declarations. Specifically, Article II, Section 2.01, of the Declarations, that lots "shall be used for residential purposes only." Furthermore, this section provides that "no buildings or other improvements at any time situate any Lot ... shall be used for *any business, commercial,* amusement, hospital, sanitarium, school, clubhouse, *religious, charitable, philanthropic* or manufacturing purposes, or as a professional office...." (Emphasis added). It is the Board's position that UPARC intends to utilize the parcel for non-residential purposes, as well as for purposes which are specifically prohibited by the Declarations. As a result, the Board believes UPARC's proposed use is adverse to the Declarations.

    In addition to Section 2.01, UPARC's proposed use may ultimately constitute a nuisance pursuant to Section 2.25 of the Declarations. Section 2.25 states that "no illegal, noxious or offensive activity, nor shall anything be permitted or done thereon which is or may become a nuisance or a source of embarrassment, discomfort or annoyance to the neighborhood or Development." The Board is concerned that the proposed use will create a nuisance.

BOCA RATON  •  FT. LAUDERDALE  •  MIAMI  •  ORLANDO  •  TALLAHASSEE  •  TAMPA  •  WEST PALM BEACH

59534



Dec-19-00  03:50    From-BROAD & CAS*                    +                    T-424  P.03    F-062

Mr. Thomas Buckley
December 18, 2000
Page 2

nuisance or a source of embarrassment, discomfort or annoyance to the neighborhood or Development." The Board is concerned that the proposed use will create a nuisance.

As a result of the above, Woodlands Estates requests the UPARC take no action with respect to moving residents into the group home until a final determination can be reached between Woodlands Estates and UPARC. In the event that UPARC moves forward with the proposed use or such ultimate determinations cannot be reached, Woodlands Estates requests sufficient written notice that it be allowed to apply to a court of competent jurisdiction for a temporary injunction or until a court of competent jurisdiction can make a final determination regarding the same. It is based on the above that Woodlands Estates is holding off filing a temporary injunction at the current time. To the extent UPARC is not agreeable to the same, please advise immediately.

On behalf of Woodlands Estates, I request you take a moment to review the issues raised herein and respond accordingly. To the extent you disagree with the position taken by Woodlands Estates, I would certainly appreciate the opportunity to review the UPARC's analysis regarding the same prior to having any specific actions taken by either party. As a result, I would appreciate your reviewing this correspondence and contacting me as soon as possible.

I look forward to hearing from you.

Respectfully yours,

JONATHAN ELLIS, P.A.

Jonathan J. Ellis
Its President

MGT
cc:    John Schaefer, President of Woodlands Estates
       Melissa G. Thorn, Esq.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION

WOODLANDS ESTATES ASSOCIATION, INC.,
a Florida nonprofit corporation,

        Plaintiff,

v.

                                    CASE NO.: 0 14 465 -CI
                                    Division    2/

THE UPPER PINELLAS ASSOCIATION
FOR RETARDED CITIZENS, INC.,
a Florida nonprofit corporation, and
GARY G. HALVERSON, INC.,

        Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF.

        Woodlands Estates Association, Inc. ("Woodlands Estates"), through its undersigned

counsel, sues The Upper Pinellas Association for Retarded Citizens, Inc. ("UPARC") and Gary

G. Halverson, Inc. ("Halverson") and states as follows:

### GENERAL ALLEGATIONS

    1.      Woodlands Estates is a Florida nonprofit corporation with its principal place of

business in Pinellas County, Florida.

    2.      Woodlands Estates is also a homeowners' association as defined Fla. Stat.

§720.301(7).

    3.      UPARC is a Florida nonprofit corporation with its principal place of business in

Pinellas County, Florida.

    4.      Halverson is a Florida corporation with its principal place of business in Pinellas

County, Florida.



5.  UPARC currently owns the real property at located 110 Arbor Lane in Pinellas County, Florida, and which is more particularly described as follows:

> **Parcel 1**
>
> Lot 147, East Lake Woodlands Unit One, according to the map or plat thereof as recorded in Plat Book 75, pages 9 through 12 of the Public Records of Pinellas County, Florida.
>
> **Parcel 2**
>
> A portion of Lot 148, East Lake Woodlands, Unit One, according to the plat thereof, as recorded in Plat Book 75, pages 9 through 12, of the Public Records of Pinellas County, Florida being more particularly described as follows: Begin at the most southerly corner of said Lot 148; thence run North 60 degrees 27' 00" West, 13.0 feet; then North 29 degrees 33' 00" East 105.00 feet; thence North 70 degrees 27' 52" East, 19.85 feet to the most Northerly corner of Lot 147; thence South 29 degrees 33' 00" West along the Lot line between said Lots 147 and 148, 120.0 feet to the Point of Beginning.

A copy of UPARC's deed, dated December 1, 2000 is attached hereto as Exhibit "A."

6.  Halverson owned the following real property:

> Lot 148, East Lake Woodlands Unit One, according to the map or plat thereof as recorded in Plat Book 75, pages 9 through 12 of the Public Records of Pinellas County, Florida.

until it transferred part of Lot 148 as more fully described as Parcel 2 in the preceding paragraph, to Murray E. Becker and Edith Becker (the "Beckers"), UPARC's predecessor in title. A copy of the November 30, 2000 deed from Halverson to the Beckers is attached hereto as Exhibit "B."

Halverson continues to own the remainder of Lot 148.

7.  The Declaration of Covenants and Restrictions for East Lake Woodlands Unit One (the "Declaration") is recorded in O.R. Book 4330, Page 984, a copy of which is attached hereto as Exhibit "C," and were assigned, for purposes including enforcement, to Woodlands Estates or its predecessor, East Lake Improvement Association, Inc., through various assignments and transfers of property and the like.

2

8.    The property owned by UPARC and Halverson is governed by the Declaration attached hereto as Exhibit "C."

9.    The Declaration is a covenant running with the land and is enforceable against UPARC and Halverson as lot owners in the property set forth above.

10.    All conditions precedent to the bringing of this action have been performed, occurred or otherwise been waived.

11.    Woodlands Estates' attorneys' fees and costs may be taxed against the Defendants pursuant to Fla. Stat. §720.301, *et seq.*

### COUNT I
#### (Injunctive Relief Based on Declaration §2.27)

12.    This is an action for injunctive relief to enforce the Declaration against UPARC and Halverson.

13.    The General Allegations are incorporated herein.

14.    Section 2.27 of the Declarations states as follows:

> ... The Lots shall not be resubdivided or replatted, except as provided in this section. Any Lot or Lots shown on the Plat may be resubdivided or replatted ( by deed or otherwise) only with the prior written approval of Developer and subject to such approval, may be subdivided or replatted in any manner which produces one or more Building Plots, each of which must meet the requirements of Section 1.01 (g). The Covenants, in the event any of said Lots shall be resubdivided or replatted as aforesaid, shall thereafter apply to the Lots as resubdivided or replatted, instead of applying to the Lots as originally platted, except that no such resubdivision or replatting shall in any way affect or impair the easements shown on the Plat.

15.    On or about November 30, 2000, Halverson transferred part of Lot 148 to the Beckers.

16.    On December 1, 2000, the Beckers transferred not only Lot 147, but the part of Lot 148 described in the preceding paragraph to UPARC.

3

17. Halverson's resubdivision of Lot 148 by transferring part of it to the Beckers and the Beckers subsequent transfer of same to UPARC is improper under §2.27 of the Declaration.

18. From a review of the November 30, 2000 Quit Claim Deed from Halverson to the Beckers and the December 1, 2000 Warranty Deed from the Beckers to UPARC, it is clear that Lot 148 has been improperly subdivided.

19. Woodlands Estates has never been requested to, nor has it, approved the subdivision of Lot 148.

20. The subdivision of Lot 148, without the approval of Woodlands Estates, is specifically prohibited under §2.27 of the Declaration.

21. Money damages are inadequate and cannot compensate Woodlands Estates for the harm caused by UPARC and Halverson.

22. UPARC and Halverson's use of the subdivided Lot 148 is a continuing violation of the Declaration.

23. Without injunctive relief, Woodlands Estates is suffering and will continue to suffer irreparable harm by virtue of, but not limited to, UPARC and Halverson's knowing and deliberate violation of the Declaration and Woodlands Estates' ability to act in the best interest of the subdivision, as a whole, is undermined and affected by UPARC and Halverson's violation.

WHEREFORE, Woodlands Estates Association, Inc. requests this Court to grant injunctive relief requiring The Upper Pinellas Association for Retarded Citizens and Halverson to fully comply with the Declaration of Covenants and Restrictions and specifically, execute the necessary documents to make Lot 148 whole once again, as it existed prior to the November 30, 2000 conveyance, as well as a judgment against UPARC and Halverson for all costs incurred in

4

bringing this action including, but not limited to, reasonable attorneys' fees and all further relief

this Court deems just and proper.

## COUNT II
### (Injunctive Relief based on Declaration §2.01)

24.     This is an action for injunctive relief against UPARC to enforce the Declaration

of Covenants and Restrictions for East Lake Woodlands Unit One.

25.     The General Allegations are incorporated by reference.

26.     Article 2.01 of the Declaration states as follows:

> The Lots and Building Plots shall be used for residential purposes only.
> Except as herein otherwise specifically provided, no structure shall be
> erected or permitted to remain on any Lot or Building Plot on the Land
> other than one single family private residence.... No buildings at any time
> situate on any Lot or Building Plot shall be used for any **business,
> commercial,** amusement, hospital, sanitarium, school, clubhouse,
> religious, **charitable, philanthropic** or manufacturing purposes, or as a
> professional office....

27.     UPARC is currently and/or proposes to operate the property owned within

Woodlands Estates for a business, commercial, charitable and/or philanthropic purposes.

28.     Woodlands Estates notified UPARC of a potential violation on December 18,

2000, a copy of such correspondence is attached hereto as Exhibit "D."

29.     Notwithstanding such notification, UPARC has set forth its intentions to use the

property for business, commercial, charitable and/or philanthropic purposes notwithstanding the

Declaration, by creating a group home of six individuals, charging rent and employing full

and/or part-time help for the individuals and accepting proceeds for such services.

30.     Woodlands Estates is without adequate remedy at law and will suffer damages if

Defendants do not comply with the Declaration.

5

31.   Money damages are inadequate and cannot compensate Woodlands Estates for the harm caused by UPARC.

32.   UPARC's use will be in violation of a continuing nature and UPARC will continue to violate the Declaration in the future.

33.   Without injunctive relief, Woodlands Estates is suffering and will continue to suffer irreparable harm by virtue of, but not limited to, UPARC's knowing and deliberate proposed violation of the Declaration and Woodlands Estates' ability to act in the best interest of the subdivision, as a whole, is undermined and affected by UPARC and Halverson's violation.

WHEREFORE, Woodlands Estates Association, Inc. requests this Court to grant injunctive relief requiring The Upper Pinellas Association for Retarded Citizens to fully comply with the Declaration of Covenants and Restrictions and specifically, not to use the property located within the Woodlands Estates subdivision for a business, commercial, charitable and/or philanthropic purpose, as well as a judgment against UPARC for all costs incurred in bringing this action including, but not limited to, reasonable attorneys' fees and all further relief this Court deems just and proper.

DATED: ___1__/__18__/__2001_____

Jonathan J. Ellis, Esq.
Florida Bar No. 863513
Broad and Cassel
100 N. Tampa, Suite 3500
Tampa, FL 33602
(813) 225-3020 / (813) 225-3039 (Fax)
Attorneys for Plaintiff

6

7S120751                    ს:4330 nნⅠ 954

DECLARATION OF COVENANTS AND RESTRICTIONS
FOR EAST LAKE WOODLANDS UNIT ONE

KNOW ALL MEN BY THESE PRESENTS:   THAT

WHEREAS, EAST LAKE WOODLANDS, LTD., a Florida limited
partnership (hereinafter sometimes referred to as Developer),
is now the owner of all of the land shown on the plat of
East Lake Woodlands Unit One, according to the plat thereof
recorded in Plat Book   75   , Page 9,10,11 12 of the current
public records of Pinellas County, Florida (hereinafter
sometimes referred to as "the Plat"); and

WHEREAS, Developer is presently developing said
subdivision to be known as East Lake Woodlands Unit One,
and Developer intends and desires to place certain covenants,
restrictions, easements, affirmative obligations, charges
and liens (hereinafter sometimes referred to as "the Covenants")
upon the use of all of the land shown on the Plat and desires
that the Covenants shall run with the title to the land
hereby restricted.

NOW, THEREFORE, for and in consideration of the
premises and for other good and valuable considerations,
Developer, for itself and its successors, grantees and
assigns, does hereby restrict the use, as hereinafter provided,
of all the lands included in the Plat (being hereinafter
sometimes referred to as "the Land") and does hereby place
upon the Land the following Covenants to run with the title
to the Land, and the grantees of and under any deed conveying
any lot or lots, parcels or tracts shown on the Plat, or
any parts or portions thereof, shall be deemed, by the
acceptance of such deed, to have agreed to all the Covenants
and to have covenanted and agreed to observe, comply with,
and be bound by the Covenants hereinafter set forth.

### ARTICLE I - DEFINITIONS

Section 1.01.  The following words and terms, when
used in this Declaration or any supplemental or amendatory
declaration (unless the context shall prohibit or clearly
indicate otherwise), shall have the following meanings:

(a)   "Developer" shall mean and refer to East
Lake Woodlands, Ltd., a Florida limited partnership, together
with its successors, grantees, and assigns.

(b)   "Plat" shall mean and refer to that certain
plat of East Lake Woodlands Unit One, according to the
plat thereof recorded among the current public records
of Pinellas County, Florida, in Plat Book   75   , Page 9,10,11,12,
together with any supplements or amendments thereto.

(c)   "Covenants" shall mean and refer to the
covenants, restrictions, easements, affirmative obligations,
charges, and liens created and imposed by this Declaration.

(d)   "Declaration" shall mean and refer to this
Declaration, together with any supplements or amendments
hereto.

(e)   "Land" shall mean and refer to all of the
lands included within the Plat, or any supplements or amendments
thereto.

(f)   "Lots" shall mean and refer to all of the
numbered lots as shown on the Plat.

LAW OFFICES
HOWELL & DEAS, P.A.
38 TELFORD BUILDING
JACKSONVILLE, FLA.
32204

Hold
AMERICAN TITLE INSURANCE COMPANY
CENTRAL TITLE DIVISION
RETURN TO
HOWELL & DEA
POST OFFICE BO

This instrument was prepared by:
WILLIAM J. DEAS
HOWELL & DEAS, P.A.
Post Office Box 2295
Jacksonville, Florida

(g)  "Building Plot" shall mean and refer to
all or parts of Lot, Lots, or Parcels and may consist of
one or more contiguous Lots, all or part of one Lot or
Parcel, all of one Lot and part of a contiguous Lot, Lots,
or Parcels, or any other combination of contiguous parts
of Lots which will form an integral unit of land suitable
for use as a residential building site, provided such plot
extends from any Access Way to an existing rear or back
property line as shown on the Plat.  However, a Building
Plot shall have an area of not less than 9,000 square feet,
except that this requirement for minimum area shall not
apply to a Building Plot which consists of or includes
an entire Lot as shown on the Plat.  No residence shall
be erected upon or allowed to occupy any Building Plot
having less than such minimum area unless the Building
Plot consists of or includes an entire Lot as shown on
the Plat.

(h)  "Access Way" shall mean and refer to Parcels
A through L, as shown on the Plat.

(i)  "Lake Parcels" shall mean and refer to
the Lake Parcels, as shown on the Plat, which are not,
however, part of the Land.

(j)  "Golf Course Parcels" shall mean and refer
to the Golf Course Parcels, as shown on the Plat, which
are not, however, part of the land.

(k)  "Utility Parcel" shall mean and refer to
the Utility Parcel, as shown on the Plat.

(l)  "Association" shall mean and refer to East
Lake Improvement Association, Inc., a Florida nonprofit
corporation, together with its successors and assigns.

(m)  "Interior Side Line" shall mean and refer
to a Lot or Building Plot side line which is not contiguous
to one or more Access Ways.

(n)  "Front Building Restriction Lines" shall
mean and refer to the building restriction lines referred
to in Note 5 of the Plat which parallel and are closest
in point of distance to the abutting Access Way or Ways.

(o)  "Rear Building Restriction Lines" shall
mean and refer to the building restriction lines referred
to in Note 5 of the Plat which are farthest in point of
distance to the abutting Access Way or Ways.

(p)  "Owner" Shall mean and refer to the record
owner, whether one or more persons, firms, or entities,
of the fee simple title to any Lot or Building Plot.

(q)  "Sewage System" shall mean and refer to
the central sanitary sewage collection and disposal system
serving or to serve the Building Plots on the Land.

(r)  "Member" shall mean and refer to all members,
regardless of class or classification, of the Association.

(s)  "Detached Outbuilding" shall mean and refer
to any garage, quarters for domestic servants, laundry
room, tool or work shop, hothouse, greenhouse, guest house,
children's playhouse, summerhouse, outdoor fireplace, barbecue
pit, swimming pool installation, or any other structure
of any kind which extends more than four feet above the
normal surface of the ground and which is detached from
the single family residence located or to be located on

LAW OFFICES
HOWELL & DEAL P.A.
...FLETCHER BUILDING
JACKSONVILLE, FLA.
32204

- 2 -

Dec-19-00  09:51    From-BROAD & CAS...                              T-424   P.06   F-062

r. t. 4330 PAGE 986

the Building Plot.

(t)  "Improved Building Plot" shall mean and refer to a Building Plot on which construction of a residential building has been substantially completed on January 1st of the calendar year for which the applicable annual maintenance assessment shall be fixed and assessed, regardless of whether the building is actually occupied or not.  Actual occupancy of all or any part of any such residential building on or before the applicable January 1st shall be deemed to constitute irrefutably conclusive evidence that the residential building is substantially completed.

## ARTICLE II – RESTRICTIONS

Section 2.01 - Lots.  The Lots and Building Plots shall be used for residential purposes only.  Except as herein otherwise specifically provided, no structure shall be erected or permitted to remain on any Lot or Building Plot on the Land other than one single family private residence. Without the prior approval of Developer, the height of the main residence on each Building Plot shall be not more than two full stories above the normal surface of the ground. No buildings at any time situate on any Lot or Building Plot shall be used for any business, commercial, amusement, hospital, sanitarium, school, clubhouse, religious, charitable, philanthropic or manufacturing purposes, or as a professional office, and no billboards or advertising signs of any kind shall be erected or displayed thereon, except such signs as are permitted elsewhere in these Covenants.  No building situate on any Lot or Building Plot shall be rented or leased separately from the rental or lease of the entire property and no part of any such building shall be used for the purpose of renting rooms therein or as a boarding house, hotel, motel, tourist or motor court or any other type of transient accommodation.  No duplex residence, garage apartment, or apartment house shall be erected or allowed to remain on any Lot or Building Plot and no building on any Lot or Building Plot at any time shall be converted into a duplex residence, garage apartment or apartment house.

Section 2.02 - Access Ways.  The Access Ways are and shall remain privately owned and the sole and exclusive property of Developer, together with its successors, assigns and grantees, if any, subject however, to the right reserved to Developer to dedicate same, as provided for in Section 2.30, infra, as well as in the Plat.  Developer, however, does hereby grant to the present and future owners of Building Plots in said subdivision of East Lake Woodlands Unit One, and their guests, invitees and domestic help and to delivery, pickup and fire protection services, police and other authorities of the law, United States mail carriers, representatives of utilities authorized by Developer to serve the Land, holders of mortgage liens on the Land and such other persons as Developer, from time to time, may designate, the nonexclusive and perpetual right of ingress, egress and access over, under, through and across the Access Ways.  Regardless of the immediately preceding provisions of Section 2.02, Developer reserves unto itself and shall have the unrestricted and absolute right to deny ingress and access to any person who, in the opinion of Developer, may create or participate in a disturbance or nuisance on any part of the land included in East Lake Woodlands Unit One, or any other Units of East Lake Woodlands, or any adjacent land owned by Developer, or its grantees, successors and assigns.

Section 2.03 - Traffic Control.  Developer shall have the right, but not the obligation, from time to time

LAW OFFICES
SWFEL & DEAS, P.A.
A FLETCHER BUILDING
JACKSONVILLE, FLA
33204

- 3 -

to control and regulate all types of traffic on the Access
Ways, including the right to prohibit use of the Access
Ways by traffic which, in the sole opinion of Developer,
would or might result in damage to the Access Ways or pavements
or other improvements thereon, and the right, but not the
obligation, to control and prohibit parking on all or any
part of the Access Ways.

Section 2.04 - View Obstructions. Developer shall
have the right, but not the obligation, to remove, relocate
or require the removal or relocation of any fence, wall,
hedge, shrub, tree or other thing, natural or artificial,
placed or located on any Building Plot if the location
of the same will, in the sole and exclusive judgment and
opinion of Developer, obstruct the vision of a motorist
upon any of the Access Ways.

Section 2.05 - Termination of Access Ways. In the
event of and to the extent that the Access Ways or easements
over, under, through and across the Access Ways for ingress,
egress, and access shall be dedicated to or otherwise acquired
by the public, the preceding provisions of Sections 2.02,
2.03 and 2.04, supra, as appropriate and required, shall
be of no further force or effect thereafter.

Section 2.06 - One Story Minimum Square Footage.
No one-story residence shall be erected or allowed to remain
on any Building Plot unless the ground floor square foot
area of the residence, exclusive of screened or unscreened
porches, garages and carports, shall equal or exceed a
minimum square footage of 1,850.

Section 2.07 - Two Story Minimum Square Footage.
No one and one-half story residence, no split-level residence,
and no two-story residence shall be erected or allowed
to remain on any Building Plot unless the total floor area
of all floors and levels of such residence, exclusive of
screened or unscreened porches, garages and carports, shall
equal or exceed a minimum square footage of 2,050.

Section 2.08 - Utility Yards. Each residence erected
on a Building Plot shall have attached thereto one or more
utility yards. At least one such utility yard shall be
constructed at the same time the main residence is constructed.
Each utility yard shall be walled or fenced and the entrance
thereto shall be screened, using materials and with a height
and of a design approved in advance by Developer, in such
manner that structures and objects located therein shall
present, from the outside of such utility yard, a broken
and obscured view up to the height of such wall or fence.
The following buildings, structures, and objects may be
erected and maintained and allowed to remain on the Building
Plot, only if the same are located wholly within the main
residence or wholly within a utility yard: Pens, yards
and houses for pets, aboveground storage of construction
materials, wood, coal, oil, gas, and other fuels, clothes
racks and clotheslines, clothes washing and drying equipment,
laundry rooms, tool shops and workshops, servants' quarters,
garbage and trash cans and receptacles, detached garages,
aboveground exterior airconditioning and heating equipment
and other mechanical equipment, together with any other
structures or objects determined by Developer, in its sole
discretion, to be of an unsightly nature or appearance.

Section 2.09 - Detached Outbuildings Prohibited.
Except as provided in Section 2.10, infra, no Detached
Outbuildings shall be erected or allowed to remain on any
part of any Building Plot.

LAW OFFICES
HOWELL & DEAS, P.A.
405 FLETCHER BUILDING
JACKSONVILLE, FLA.
32202

- 4 -

### Section 2.10 - Detached Outbuildings Permitted.

Any Detached Outbuilding may be erected and maintained within a utility yard required by Section 2.08, supra, but any such Detached Outbuilding, any part of which extends above the top of the fence or wall enclosing such utility yard, shall be subject to the approval of Developer, pursuant to the provisions of Section 2.12, infra.  Detached outbuildings which are not required to be located in a utility yard under the provisions of Section 2.08, supra, may be erected and allowed to remain on a Building Plot outside of a utility yard meeting the requirements of Section 2.08, supra, if the same have been approved by Developer, pursuant to the provisions of Section 2.12, infra, but such Detached Outbuilding shall not be commenced, erected, maintained or allowed to remain on the Building Plot outside of such a utility yard unless and until such approval has been first obtained.

### Section 2.11 - Building Restriction Lines.

(a)  There are Front Building Restriction Lines and Rear Building Restriction Lines referred to in Note 5 of the Plat which affect each Lot.

(b)  No building, Detached Outbuilding, utility yard, hedge, fence, wall or any type or kind of permanent structure (except walks, drives, and parking areas, the location and design of which have been previously approved by Developer), or any part of any of the same, shall be erected, placed, or allowed in the area of any Building Plot on the Land lying between the Front Building Restriction Line and the Access Way or Ways on which the Building Plot abuts, except that with the prior written consent of Developer, and subject to the conditions and requirements of any such consent, a hedge, fence, or wall, may be erected, placed, and allowed in such area.

(c)  No building, Detached Outbuilding, utility yard, hedge, fence, wall or any type or kind of permanent structure, or any part of any of same, shall be placed or allowed in the area of any Building Plot (except those Building Plots abutting any Golf Course Parcel or Lake Parcel) on the Land lying between the Rear Building Restriction Line and the rear or back line of the Building Plot, except that a hedge, fence or wall which extends not more than four feet above the surface of the ground and which conforms with and does not violate any provisions hereof may be erected, placed, or allowed in the area between the Rear Building Restriction Line and the rear or back line of the Building Plot and any structure other than a hedge, fence or wall which extends not more than four feet above the surface of the ground and which conforms with and does not violate other provisions hereof may be erected, placed, and allowed in any portion of said area which is located more than five feet from a side or rear line of the Building Plot.

(d)  No building, Detached Outbuilding, utility yard, hedge, fence, wall or any type or kind of permanent structure, or any part of any of same, shall be erected, placed or allowed in the area of any Building Plot abutting any Golf Course Parcel or Lake Parcel on the Land lying between the Rear Building Restriction Line and the rear or back line of the Building Plot.

(e)  No part of any building, Detached Outbuilding, utility yard, hedge, fence, wall, or any type or kind of permanent structure (except drives and walks) which is located in the area of any Building Plot on the Land bounded by the Front and Rear Building Restriction Lines and the

LAW OFFICES

HONWELL & DIAS P.A.

AN FILLOETT BUILDING

MELBOURNE, FLA.

32904

- 5 -

c. 14330 PAGE 989

Interior Side Lines or Line of the Building Plot shall
be erected, placed, or allowed nearer than 7-1/2 feet to
any Interior Side Line of the Building Plot, except that
within the area bounded as above set forth all or any part
of a utility yard (including structures or objects therein),
hedge, fence, or wall which do not extend more than five
feet above the surface of the ground and which confirm
with and do not violate any provisions hereof may be erected,
placed, and allowed nearer than 7-1/2 feet to any Interior
Side Line of the Building Plot, provided, however, that
no such utility yard, hedge, fence, or wall shall be erected,
placed or allowed nearer than three feet to any Interior
Side Line without the prior written consent of Developer.

        (2)  Notwithstanding any other provisions of
these Covenants:

            (1)  No utility yard, fence, wall or any
type or kind of permanent structure shall be erected, allowed,
or placed within any of the areas designated on the Plat
as easements. Any hedge, shrub, tree or other planting
placed within any of the areas designated on the Plat as
easements shall forthwith be removed by the Building Plot
owner if and when such owner is required or requested so
to do by Developer.

            (2)  Any utility yard, fence, wall, hedge,
shrub, tree, or other planting or other structure or improve-
ment erected or placed within any of the easement areas
reserved or given in these Covenants, but not designated
as easements on the Plat, if any, shall forthwith be removed
by the Building Plot owner if and when such owner is required
or requested so to do by Developer.

        Section 2.12 - Architectural Approval. For the
purpose of further insuring the development of the Land
as a residential area of the highest quality and standards,
and in order that all improvements on each Building Plot
shall present an attractive and pleasing appearance from
all sides and from all points of view, Developer reserves
the exclusive power and discretion to control and approve
all of the buildings, structures, and other improvements
on each Building Plot in the manner and to the extent set
forth herein. No residence or other building, and no fence,
wall, utility yard, driveway, swimming pool, or other structure
or improvement, regardless of size or purpose, whether
attached to or detached from the main residence, shall
be commenced, placed, erected, or allowed to remain on
any Building Plot, nor shall any addition to or exterior
change or alteration thereto be made, unless and until
building plans and specifications covering the same, showing
the nature, kind, shape, height, size, materials, floor
plans, exterior color schemes with paint samples, location
and orientation on the Building Plot, approximate square
footage, construction schedule, on-site sewage and water
facilities, and such other information as Developer shall
require, including, if so required, plans for the grading
and landscaping of the Building Plot, showing any changes
proposed to be made in the elevation or surface contours
of the land, have been submitted to and approved in writing
by Developer and until a copy of all such plans and specifica-
tions, as finally approved in writing by Developer, have
been deposited permanently with Developer. Developer shall
have the absolute and exclusive right (without the incurring
of any liability for such) to refuse to approve any such
building plans and specifications and lot-grading and landscap-
ing plans which are not suitable or desirable in its opinion
for any reason, including purely aesthetic reasons, as
well as reasons connected with future development plans

LAW OFFICES
HOWELL & DEAS, P.A.
405 FLORIDA BUILDING
JACKSONVILLE, FLA.
32202

- 6 -

ᴇ.ᴇ.4330 ᴘᴀɢᴇ 990

of Developer of the Land or any contiguous or adjacent
lands.  In this connection, Developer shall have the right
to require that the outside of fences, walls, or utility
yards be appropriately landscaped.  In passing upon such
building plans and specifications and lot-grading and landscap-
ing plans, Developer may take into consideration the suitability
and desirability of the proposed construction and of the
materials of which the same are proposed to be built to
the Building Plot upon which it is proposed to erect the
same, the quality of the proposed workmanship and materials,
the harmony of external design with the surrounding neighborhood
and existing structures therein, and the effect and appearance
of such construction as viewed from neighboring properties.
Such building plans and specifications shall be prepared
by a qualified, registered architect for the specific use
of the property owner submitting the same, and shall consist
of not less than the following:  Foundation plans, floor
plans of all floors, section details, elevation drawings
of all exterior walls, roof plan and plot plan showing
location and orientation of all buildings and other structures
and improvements proposed to be constructed on the Building
Plot, with all applicable building restriction lines shown
thereon.  In addition, there shall be submitted to Developer
for approval such samples of building materials proposed
to be used as Developer shall specify and require.  Regardless
of the preceding provisions of this Section 2.12, it shall
not be necessary to submit plans and specifications to
or to obtain the approval of Developer for any Detached
Outbuilding which is to be erected and maintained wholly
within a utility yard required by Section 2.08, _supra_,
if no part of such Detached Outbuilding extends above the
top of the fence or wall enclosing such utility yard.
In the event that Developer fails to approve or disapprove
such building plans and specifications within 60 days after
the same have been submitted to it as required above, the
approval of Developer shall be conclusively and irrefutably
presumed and the provisions of this Section 2.12 shall
be deemed to have been complied with.  However, no residence
or other building, structure, or improvement which violates
any of the Covenants or which is not in harmony with the
surrounding neighborhood and the existing structures therein
shall be erected or allowed to remain on any part of a
Building Plot on the Land.  The issuance of a building
permit or license, which may be in contravention of these
Covenants, shall not bar, preclude, or prevent Developer
from enforcing the provisions of this Section 2.12.

        Section 2.13 - Garages.

        (a)  All garages not located within a utility
yard meeting the requirements of Section 2.08, _supra_, shall
have the capacity for at least two automobiles.

        Section 2.14 - Vehicular Parking.  No wheeled vehicles
of any kind and no boats may be kept or parked on the Building
Plot, unless they are completely inside a garage attached
to the main residence or within a utility yard meeting
the requirements of Section 2.08, _supra_, except that private
automobiles of the occupants bearing no commercial signs
may be parked in the driveway or parking area on the Building
Plot from the commencement of use thereof in the morning
to the cessation of use thereof in the evening, and additionally,
with, but only with, the prior written consent of Developer
may be parked overnight in such driveway or parking area,
except that private automobiles of guests of the occupants
may be parked in such driveway or parking area, and except
further that other vehicles may be parked in such driveway
or parking area during the times necessary for pickup and
delivery service, provided that such permission is granted

LAW OFFICES
COWELL & DIAS, P.A.
441 FLORIDA BUILDING
JACKSONVILLE, FLA.
32202

Dec-19-00  09:54    From-BROAD & CA                    +        ⌣        T-424   P.11    F-062

ß, ß, 4330 page 991

solely for the purpose of such service.  No wheeled vehicle
or boat which by reason of its site would not be substantially
obscured from view from the outside of a utility yard shall
be kept or parked in any such utility yard.

Section 2.15 - Lot Plates.  A plate showing the
number of the residence shall be placed on each Building
Plot on which a building is located; and, at the option
of the property owner, a name plate showing the name of
the owner may also be placed on such Building Plot.  However,
the size, location, design, style, and type of material
for each such plate shall be first approved by Developer.

Section 2.16 - Window Airconditioners and Fans.
Unless the prior approval of Developer has been obtained,
no window airconditioning units, window fans, or exhaust
fans shall be installed in any side of a building which
faces an Access Way.

Section 2.17 - Construction.

(a)  Within 2 years after the date of recording
the deed from Developer, the Owner of any Building Plot
must commence actual construction of a residence thereon,
with said residence to be designed and constructed in accord-
ance with the Covenants.

(b)  When the construction of any building is
once begun, work thereon shall be prosecuted diligently
and continuously until the full completion thereof.  The
main residence and all related structures shown on the
plans and specifications approved by Developer pursuant
to Section 2.12, supra, must be completed in accordance
with said plans and specifications within eighteen months
after the start of the first construction upon each Building
Plot unless such completion is rendered impossible as the
direct result of strikes, fires, national emergencies,
or natural calamities.  Prior to completion of construction,
the property owner shall install at his expense a suitable
paved driveway from the paved portion of the abutting Access
Way to his Building Plot line and shall remove the curbing
at the edge of the paved portion of the abutting Access
Way to the extent necessary for entrance into the driveway
and replace same with suitable valley curb or gutter so
as to provide for entrance into the driveway and also proper
and continued drainage along the edge of the paved portion
of the Access Way.  The design and type of material for
each such driveway and curb or gutter shall first be approved
by Developer in writing and the subsurface of the portion
of the driveway between the Building Plot line and the
paved portion of the abutting Access Way as well as the
replacement curb or gutter shall be installed prior to
commencement of any construction and prior to delivery
of construction materials to the Building Plot.  During
construction on any Building Plot, all vehicles involved
in such construction, including those delivering material
and supplies, shall enter upon such Building Plot from
the Access Way only over the installed replacement curb
or gutter and driveway subsurface, and such vehicles shall
not be parked at any time on the Access Way or Ways or
upon any property other than the Building Plot on which
the construction is proceeding.

Section 2.18 - Prohibitions Prior to Construction.
No picnic areas and no Detached Outbuildings shall be erected
or permitted to remain on any Building Plot prior to the
start of construction of a permanent residence thereon.

Section 2.19 - Temporary Buildings.  Except for

LAW OFFICES
DWITT & DIAS, P.A.
½ FLETCHER BUILDING
JACKSONVILLE, FLA.
32904

о. в. 4330 расе 932

structures which are permitted by other provisions hereof
to be located within the utility yard referred to in Section
2.08, supra, no shed, shack, trailer, tent or other temporary
or movable building or structure of any kind shall be erected
or permitted to remain on any Building Plot. However,
this section shall not prevent the use of a temporary construc-
tion shed during the period of actual construction of the
main residence and other buildings permitted hereunder,
nor the use of customary temporary sanitary toilet facilities
for workmen during the course of such construction.

Section 2.20 - Temporary Residences. No trailer, base-
ment, garage, or any outbuilding of any kind, other than guest
house or servants' quarters, even if otherwise permitted here-
under to be or remain on a Building Plot, shall at any time
be used as a residence, either temporarily or permanently.

Section 2.21 - Signs.

(a)  Except as otherwise permitted herein, no
sign of any character shall be displayed or placed upon
any Building Plot, except "For Sale" signs, which signs
may refer only to the particular Building Plot on which
displayed, shall not exceed two square feet in size, shall
not extend more than three feet above the surface of the
ground, shall be fastened only to a stake in the ground,
and shall be limited to one sign to a Building Plot. However,
when a residence on a Building Plot is "open for inspection",
and when and only so long as the particular residence is
attended by a representative of the owner of the residence,
then and only then, a sign advertising such, which sign
shall not exceed three square feet in size, and which shall
meet all of the other requirements of this Section 2.21(a),
may be displayed or placed. Developer may enter upon any
Building Plot and summarily remove and destroy any signs
which do not meet the provisions of this section.

(b)  Nothing contained in these Covenants shall
prevent Developer, or any person designated by Developer,
from erecting or maintaining such commercial and display
signs and such temporary dwellings, model houses, and other
structures as Developer may deem advisable for development
purposes, including construction of any improvements or
structures thereon, provided such are in compliance with
the appropriate governmental requirements or regulations
applicable thereto.

Section 2.22 - Aerials. No exterior radio or television
mast, tower, pole, wire, aerial, antenna, or appurtenances
thereto, nor any other exterior electronic or electrical
equipment, structures, devices or wires of any kind shall
be installed or maintained on the exterior of any structure
located on a Building Plot or on any portion of any Building
Plot not occupied by a building or other structure unless
and until the location, size, and design thereof shall
have been approved by Developer. The provisions of this
section shall not apply to equipment or devices located
wholly within a utility yard meeting the requirements of
Section 2.08, supra, and which are not visible to a person
standing outside the utility yard.

Section 2.23 - Electrical Interference. No electrical
machinery, devices or apparatus of any sort shall be used
or maintained in any structure located on a Building Plot
which causes interference with the television or radio
reception in any structures located on other Building Plots.

Section 2.24 - Animals. No horses, mules, ponies,
donkeys, burros, cattle, sheep, goats, swine, rodents,

LAW OFFICES
ROVIRA & DIAS, P.A.
150 FLEEDER BUILDING
JACKSONVILLE, FLA.
33204

O.R.4330 PG 993

reptiles, pigeons, pheasants, game birds, game fowl, poultry,
or guineas shall be kept, permitted, raised or maintained
on any Building Plot.  No other animals, birds or fowl
shall be kept, permitted, raised, or maintained on any
Building Plot, except as permitted in this section.  Not
more than two dogs, not more than two cats, not more than
six birds and not more than ten rabbits may be kept on
a single Building Plot for the pleasure and use of the
occupants, but not for any commercial or breeding use or
purpose, except that if any of such permitted animals or
birds shall, in the sole and exclusive opinion of Developer,
become dangerous or an annoyance or nuisance in the neighborhood
or nearby property or destructive of wildlife, they may
not thereafter be kept on the Building Plot.  Birds and
rabbits shall be kept caged at all times.

     **Section 2.25 - Nuisances.**  No illegal, noxious,
or offensive activity shall be permitted or carried on
on any part of the Land, nor shall anything be permitted
or done thereon which is or may become a nuisance or a
source of embarrassment, discomfort or annoyance to the
neighborhood.  No trash, garbage, rubbish, debris, waste
material, or other refuse shall be deposited or allowed
to accumulate or remain on any part of the Land, nor upon
any land or lands contiguous thereto.  No fires for the
burning of trash, leaves, clippings, or other debris or
refuse shall be permitted on any part of the Land, except
by Developer.

     **Section 2.26 - Trees.**  No owner of a Building Plot
shall plant or place any shrubbery, hedges, trees or other
plantings on any part of the Land lying outside the owner's
Building Plot.  No living tree having a diameter greater
than four inches measured at a height of four feet above
ground level, may be cut on any of the Land without first
obtaining the written consent of Developer, except such
trees as shall be growing within twenty feet of the residence
and attached utility yard proposed to be erected on the
Building Plot.

     **Section 2.27 - Replatting.**  The Lots shall not be
resubdivided or replatted, except as provided in this section.
Any Lot or Lots shown on the Plat may be resubdivided or
replatted (by deed or otherwise) only with the prior written
approval of Developer and subject to such approval, may
be subdivided or replatted in any manner which produces
one or more Building Plots, each of which must meet the
requirements of Section 1.01 (g).  The Covenants, in the
event any of said Lots shall be resubdivided or replatted
as aforesaid, shall thereafter apply to the Lots as resubdivided
or replatted, instead of applying to the Lots as originally
platted, except that no such resubdivision or replatting
shall in any way affect or impair the easements shown on
the Plat.

     **Section 2.28 - Golf Course and Lake Parcels.**  Certain
parcels of property owned by Developer are variously labeled
as Golf Course Parcels and Lake Parcels and are shown on
the Plat as "Unplatted".  Regardless of the location of
said parcels shown as "Unplatted", and regardless of the
use to which the parcels now or hereafter may be put, said
parcels are and shall remain privately owned and the sole
and exclusive property of Developer (free and clear of
the Covenants), together with its successors, assigns and
grantees, if any, of said parcels or of any rights or interests
therein, and may be used for any purpose or purposes as
shall be determined by Developer and its successors, assigns,
and grantees, if any, of such parcels or of any rights
or interests therein.  The owners of Lots shall not acquire

LAW OFFICES
HOWELL & DEAS, P.A.
Blackstone Building
JACKSONVILLE, FLA.
32202

- 10 -

c. L 4330 PAGE 994

and shall not have at any time any right to go upon and
make any use of or place any structure or object on the
parcels or any rights, title, interest, easements or privileges
of any kind in, to, over, upon or with respect to any of
said parcels, except as may be specifically set forth herein.
Should the owners of Lots in said subdivision or any other
persons be permitted or allowed any rights to the use of
any part of said parcels, either by acquiescence, by the
express consent of Developer, or by the provisions set
forth herein, all such rights may be terminated and cancelled
by Developer at any time without cause or liability of
Developer.

Section 2.29 - Usage of Lake Parcels.

(a)  Lakes are presently located on portions
of the Lake Parcels. Subject to the provisions of Section
2.28, supra, and of this section, and to the control of
Developer, the residents of each Lot adjacent to each of
said parcels shall have the right to use the lake, but
solely at their own risk. With the prior consent of Developer,
but only with such consent, others may use one or more
of said lakes, but again, any such use shall be solely
at the risk of the user.

(b)  No pier, dock, boathouse, bulkhead or other
structure of any kind shall be erected, placed, or permitted
to remain on, in, adjacent to, bordering on, or over any
portion of said lakes.

(c)  Each Lot owner whose Lot adjoins or abuts
said lake, shall keep his Lot and the portion of the adjoining
or abutting parcel between his Lot and the water's edge
at the lake bank, grassed, trimmed, and cut, and properly
maintained so as to present a pleasing appearance, maintain
the proper contour of the lake bank, and prevent erosion.
However, except with the prior written approval of Developer,
the shoreline contour of the lake may not be changed and
no Lot may be increased in size by filling in the lake
and no Lot may be dug out or dredged so as to cause the
water of the lake to protrude into the Lot.

(d)  Developer shall have the sole and absolute
right, but not the obligation, to control the water level
of each and all of the above mentioned lakes, and to control
the growth and eradication of plants, fowl, reptiles, animals,
fish, bacteria, and fungi in or on each and all of said
lakes.

(e)  No boats, rafts or floating objects of
any kind other than small row boats, small sail boats,
and canoes, none of which shall be motor-driven, shall
be brought or operated on any of said lakes, and no swimming
shall be allowed in said lakes.

(f)  Except with the prior written consent of
Developer, no Lot owner or resident shall have the right
to pump or otherwise remove any water from any of said
lakes for the purpose of irrigation or other use, nor to
place rocks, stones, trash, garbage, sewage, water discharged
from swimming pools or heating or airconditioning systems,
waste water (other than surface drainage or run-off), rubbish,
debris, ashes or other refuse in any of said lakes.

(g)  Developer may, at any time, without cause
or liability, terminate all or any part of the uses hereby
permitted to be made of all or any parts of said lakes.

Section 2.30 - Dedication.  Developer shall have

LAW OFFICES
.WELL & DEAS, P.A.
18 PITTENGER BUILDING
JACKSONVILLE, FLA
32204

- 11 -

the sole and absolute right at any time, with the consent
and subject to the acceptance of the Board of County Commissioner:
of Pinellas County or the governing body of any municipality
or body politic then having jurisdiction over the land
shown on the Plat, to dedicate to the public all or any
part of the following:

    (a)   The Utility Parcel;

    (b)   The Access Ways;

    (c)   Any easements referred to herein, including
those shown on the Plat.

Section 2.31 - Lot Maintenance.  The owner of each
Building Plot, whether such Building Plot be improved or
unimproved, shall keep such Building Plot free of tall
grass, undergrowth, dead trees, dangerous and/or dead tree
limbs, weeds, trash and rubbish, and shall keep such Building
Plot at all times in a neat and attractive condition.
In the event the owner of any Building Plot fails to comply
with the preceding sentence of this Section 2.31, Developer
shall have the right, but not the obligation, to go upon
such Building Plot and to cut and remove tall grass, undergrowth
and weeds, and to remove rubbish and any unsightly or undesir-
able things and objects therefrom, and to do any other
things and perform and furnish any labor necessary or desirable
in its judgment to maintain the property in a neat and
attractive condition, all at the expense of the owner of
such Building Plot, which expense shall be payable by such
owner to Developer on demand.

## ARTICLE III - UTILITIES

Section 3.01 - Underground Lines.  All telephone,
electric and other utilities lines and connections between
the main or primary utilities lines and the residence and
other buildings located on each Building Plot shall be
concealed and located underground so as not to be visible.
Electrical service is provided by Florida Power Corporation
through underground primary service lines running to transformers
Developer is providing an underground conduit to serve
each Lot extending from the point of the applicable transformer
to a point at or near the Lot line, with such conduits
being located in Access Ways or easement areas.  Each Lot
owner who requires an original or additional electric service
shall be responsible to complete, at his expense, the secondary
electric service conduits, wires (including those in the
conduits provided by Developer), conductors and other electric
facilities from the point of the applicable transformer
to the residence and other buildings on the Building Plot,
and all of the same shall be and remain the property of
the owner from time to time of each such Lot.  The conduit
provided by Developer to serve each such Lot shall be,
become and remain the property of the owner from time to
time of that Lot.  The owner from time to time of each
Lot shall be responsible for all maintenance, operation,
safety, repair and replacement of the entire secondary
underground electric system extending from the applicable
transformer to the residence and other buildings on his
Lot.

Section 3.02 - Garbage.  No garbage or trash incinerator
shall be placed or permitted to remain on a Building Plot
or any part thereof.  Garbage, trash and rubbish shall
be removed from the Building Plots only by services or
agencies previously approved in writing by Developer.
After the erection of any building on any Building Plot,
the owner shall keep and maintain on said Building Plot

LAW OFFICES
SWELL & DEAS, P.A.
de VICENTE BUILDING
JACKSONVILLE, FLA.
32204

- 12 -

covered garbage containers in which all garbage shall be
kept until removed from the Building Plot.  Such garbage
containers shall be kept at all times within a utility
yard.

     Section 3.03 - Mail.  No mailbox or paper box or
other receptacle of any kind for use in the delivery of
mail or newspapers or magazines or similar material shall
be erected or located on any Building Plot unless and until
the size, location, design and type of material for said
boxes or receptacles shall have been approved by Developer.
If, as, and when the United States Postal Service or the
newspaper or newspapers involved shall indicate a willingness
to make delivery to wall receptacles attached to the residence,
each property owner, on the request of Developer, shall
replace the boxes or receptacles previously employed for
such purpose or purposes with wall receptacles attached
to the residence, the size, location, design, style, and
type of material for said wall receptacles to be subject
to prior approval by Developer.

     Section 3.04 - Wells.  No wells may be drilled or
maintained on any Building Plot without the prior written
approval of Developer.  Any such approved wells shall be
constructed, maintained, operated, and utilized by the
owners of said Building Plot in strict accordance with
any and all applicable statutes and governmental rules
and regulations pertaining thereto.

     Section 3.05 - Sewage.  The Sewage System shall
be the sole and exclusive sanitary sewage disposal service
or facility used to serve each Building Plot on the Land,
the improvements thereon, and the occupants thereof.  The
owner of each Building Plot shall, at his expense, connect
his sewage disposal lines to the sewage collection line
provided as a part of the Sewage System to serve that owner's
Building Plot, so as to comply with the requirements of
the operation of the Sewage System and shall pay such connec-
tion charges as are approved by Developer and required
to be paid by the operator of the Sewage System.  After
such connection each property owner shall pay when due
the periodic charges or rates for the furnishing of such
sewage disposal service made by the operator of the Sewage
System.  No septic tank shall be permitted on any Building
Plot, and no sewage disposal service or facility shall
be used to serve the Building Plot or any improvements
thereon or the occupants thereof other than the Sewage
System.  No sewage shall be discharged onto the open ground
or into any marsh, lake, pond, park, ravine, drainage ditch,
canal, or Access Way.  Except with the prior written consent
of Developer and of the operator of the Sewage System,
no water discharged from heating or airconditioning systems
or from a swimming pool shall be discharged into the sewage
collection lines of the Sewage System.

     Section 3.06 - Easements.  Developer, for itself
and its grantees, successors and assigns, hereby reserves
and is given a perpetual, assignable, alienable and releasable
easement, privilege, and right on, over, under and through
the ground, to erect, maintain, and use electric and telephone
poles, wires, cables, conduits, water mains, drainage lines,
or drainage ditches, sewers, and other suitable equipment
for drainage and sewage disposal purposes or for the installa-
tion, maintenance, transmission, and use of electricity,
central television antenna, security systems, telephone,
gas, lighting, heating, water, drainage, sewage and other
convenience or utilities on, in, over and under all of
the easements shown on or referred to in the Plat (whether
such easements are shown on the Plat to be for drainage,

O. R. 4330 PAGE 997

utilities or other purposes) and (b) in, over and under a
five-foot strip at the back of each Lot and on, in, over
and under a five-foot strip along the Interior Side Lot
Lines of each Lot shown on the Plat.  Developer shall have
the unrestricted and sole right and power of alienating,
encumbering, and releasing the privileges, easements and
rights referred to in this Section 3.06.  The owners of
the Lot or Lots, subject to the privileges, rights and
easements referred to in this Section 3.06, shall acquire
no right, title or interest in or to any poles, wires,
cables, conduits, pipes, mains, valves, lines or other
equipment or facilities placed on, in, over or under the
property which is subject to said privileges, rights and
easements.  All such easements, including those designated
on the Plat, are and shall remain private easements and
the sole and exclusive property of Developer and its grantees,
successors and assigns.

## ARTICLE IV – ASSOCIATION

### Section 4.01 – Assessments.

(a)  Each Building Plot in East Lake Woodlands
Unit One, hereby is subjected to an annual maintenance
assessment as hereinafter provided.  Such annual maintenance
assessment shall be assessed for and shall cover the calendar
year.  Commencing January 1, 1976, and on the same day
of each year thereafter, each Building Plot owner in East
Lake Woodlands Unit One, shall pay to the Association,
at the office of the Association in Palm Harbor, Pinellas
County, Florida, or at such other place as shall be designated
by the Association, in advance, the annual maintenance
assessment assessed against such owner's Building Plot,
as fixed by the Association, and such payments shall be
used by the Association to create and continue maintenance
funds to be used as hereinafter set forth.  Such annual
maintenance assessment shall become delinquent if not paid
by February 1 of the calendar year for which assessed,
and shall bear interest at the rate of nine per cent per
annum from said date until paid.  The annual maintenance
assessment may be adjusted from year to year by the Association
as the needs of the property subject thereto may require,
in the sole judgment of the Association.

(b)  Such annual maintenance assessment shall
consist of an "annual basic charge" and, if so determined
by the Association, an "annual additional charge" as follows:

(1)  Each Building Plot, improved or unimproved,
shall be assessed and the owner thereof shall pay an "annual
basic charge".  Such "annual basic charge" shall be assessed
against such Building Plots proportionately to their respective
square foot areas, but in no event shall such "annual basic
charge" exceed one cent per square foot of area per year;

(2)  In addition to the "annual basic charge"
and regardless of whether the maximum amount of "annual
basic charge" has been assessed, each Improved Building
Plot, if so determined by the Association, shall be assessed
and the owner thereof shall pay an "annual additional charge"
in such amount as the Association shall fix.  Such "annual
additional charge", if so fixed and assessed, shall be
uniform in dollar amount as between all Improved Building
Plots in East Lake Woodlands Unit One, and all Improved
Building Plots in any additional subdivisions of lands
which are subjected by Developer to annual maintenance
assessments pursuant to the provisions of Section 4.05,
infra.  However, if any such "annual additional charge",
with respect to any single Improved Building Plot, shall

LAW OFFICES

WELL & DEAS, P.A.
FLETCHER BUILDING
JACKSONVILLE, FLA.
32202

ε. ι. 4330 PAGE 998

exceed a maximum of 5 mills on the dollar of the full assessed value (unreduced by any homestead or other exemption) of such Improved Building Plot and the improvements constructed thereon (exclusive of personal property) as fixed by the assessor for ad valorem real estate taxation by Pinellas County, Florida (or, if there be no such taxation by Pinellas County, Florida, then as fixed by an assessor for comparable taxation by the governing governmental authority) for the calendar year covered by such "annual additional charge", the Building Plot owner shall be entitled to a refund of such excess, provided written application therefor is filed with the Association at its office on or before December 31st of such year.  If a timely written application for such is not filed, then the right to such a refund shall be deemed to have been waived.

### Section 4.02 - Minimum Assessment Requirements.

(a)  The Association annually shall fix and assess against the Building Plots, and the Building Plot owners in East Lake Woodlands Unit One, shall pay, as a part of the annual maintenance assessment, such minimum rate or amount as shall be sufficient, in the judgment of the Association, to enable the Association:

(1)  To make payment of all ad valorem taxes assessed against any of the Access Ways as shown on the Plat, and to make payment of all ad valorem taxes assessed against any properties, real or personal, or any interest therein, owned by or leased to the Association, and to make payment of any other taxes, including income taxes, payable by the Association;

(2)  To pay all annual current expenses required for the reasonable repair and maintenance of the Access Ways, including the paved portions thereof;  and

(3)  To provide a deposit to a reserve fund (hereinafter sometimes referred to as the "paving reserve fund") which, with future annual deposits thereto, will be sufficient in the judgment of the Association to cover the cost of anticipated future periodic major construction and reconstruction, including complete resurfacing, of the paved portions of the Access Ways which are part of the land included in the Plat.  The funds deposited to the Paving Reserve Fund of East Lake Woodlands Unit One, shall not be used for any purpose other than the periodic major construction and reconstruction, including complete resurfacing, of the paved portions of the Access Ways which are part of the land included in the Plat, and repair and maintenance of the Access Ways incidental to such major construction and reconstruction.

(b)  The Association, by assessing and collecting annual maintenance assessments, shall thereby obligate itself to make the payments and deposits referred to in Section 4.02(a), supra.  In fixing the minimum rate or amount of assessment referred to in Section 4.02(a), supra, the Association may take into account any maintenance or construction work on the Access Ways assumed or to be performed by any public body.

### Section 4.03 - Permissible Expenditures.  The maintenance funds provided by the annual maintenance assessments, to the extent not required for the purposes as set forth in Section 4.02, supra, may be used for the following, but only for the following purposes:

(a)  Payment of operating expenses of the Association;

Dec-19-00  10:02    From-BROAD & CAS⁵ⁿ⁵                                    T-424  P.19/25  F-062

(b)  Lighting, improvement, and beautification of Access Ways and easement areas, and the acquisition, maintenance, repair, and replacement of directional markers and signs and traffic control devices, together with the costs of controlling and regulating traffic on the Access Ways;

(c)  Maintenance, improvement and operation of drainage easements and systems, if any;

(d)  Maintenance, improvement and beautification of parks, lakes, ponds, and buffer strips;

(e)  Garbage collection and trash and rubbish removal, but only when and to the extent specifically authorized by the Association;

(f)  Providing police protection, night watchmen, guard and gate services, but only when and to the extent specifically authorized by the Association;

(g)  Providing fire protection, but only when and to the extent specifically authorized by the Association;

(h)  Providing emergency health care, including ambulance and emergency care medical facilities, including the equipment necessary to operate such facilities, but only when and to the extent specifically authorized by the Association;

(i)  Providing insect and pest control to the extent that it is necessary to supplement the services provided by the state and local governments and agencies, but only when and to the extent specifically authorized by the Association;

(j)  Providing for the improvement of fishing available to owners of Lots, but only when and to the extent specifically authorized by the Association;

(k)  Providing for the operation of transportation facilities between key points of the Land and airports, other public transportation centers, and public centers serving the area surrounding the Land, but only when and to the extent specifically authorized by the Association;

(l)  Doing any other thing necessary or desirable, in the judgment of the Association, to keep the Land neat and attractive or to preserve or enhance the value of the properties therein, or to eliminate fire, health or safety hazards, or which, in the judgment of the Association, may be of general benefit to the owners or occupants of the Land.

(m)  Doing any other thing agreed to by the Association and by the persons then owning 75 per cent or more of the Improved Building Plots then located in East Lake Woodlands Unit One, and any additional subdivisions of lands which may be subjected by Developer to annual maintenance assessments pursuant to the provisions of Section 4.05, infra.

(n)  Repayment of funds and interest thereon, borrowed by the Association and used for any of the purposes referred to herein.

Section 4.04 - Collection of Assessments.

LAW OFFICES
OWEIL & DIAS, P.A.
20 FLETCHER BUILDING
JACKSONVILLE, FLA.
32704

- 16 -

o. t. 4330 page 1000

(a)   Except as otherwise provided herein, it shall not be necessary for the Association to allocate or apportion the maintenance funds or expenditures therefrom among the various purposes specified herein, and the judgment of the Association in the expenditure of the maintenance funds shall be final.   The Association, in its sole discretion, may hold the maintenance funds as invested or uninvested funds, and may reserve such portions of the maintenance funds as the Association determines advisable for expenditure in years following the year for which the annual maintenance assessment was assessed.

(b)   Each annual maintenance assessment and interest thereon shall constitute a debt from the owner or owners of the property against or with respect to which the same shall be assessed, payable to the Association on demand, and shall be secured by a lien upon such property and all improvements thereon.   Said lien shall attach annually as hereinafter provided and shall be enforceable by the Association in a court of competent jurisdiction.   In the event the Association shall be required to institute proceedings to collect or enforce such assessment or the lien therefor, the Association shall be entitled to recover from the owner or owners of such property all costs, including reasonable attorneys' fees and appellate attorneys' fees, incurred in and about such proceedings and all such costs shall be secured by such lien.

(c)   Each such annual lien, as between the Association on the one hand, and the owner and owners of such property and any grantee of such owner and owners on the other hand, shall attach to the property and improvements against which such annual maintenance assessment shall be assessed and fixed as of January 1 of the year for which such annual maintenance assessment shall be assessed, said date of January 1 of each year being the attachment date of each such annual lien.   However, regardless of the preceding sentence of this subparagraph, each such annual lien shall be subordinate and inferior to the lien of any first mortgage encumbering said property and improvements if, but only if, such mortgage was recorded in the public records of Pinellas County, Florida, prior to the attachment date of such lien.   The foreclosure of any such first mortgage and the conveyance of title pursuant to foreclosure proceedings or by voluntary deed in lieu of foreclosure, or by deed unconnected with foreclosure, shall not affect or impair the existence, validity, or priority of the annual maintenance assessment liens subsequently assessed hereunder with respect to such property and improvements.   Upon request, the Association shall furnish any owner or mortgagee a certificate showing the unpaid maintenance assessments, if any, against any property and the year or years for which any such unpaid maintenance assessments were assessed and fixed.

Section 4.05 – Additional Subdivisions.   Developer may heretofore or hereafter plat additional subdivisions of lands contiguous to or nearby East Lake Woodlands Unit One, and Developer reserves and has the right to subject the lands in any and all such additional subdivisions and the purchasers of lots therein to annual maintenance assessments, and to grant to the Association rights, powers, duties and obligations with respect to such annual maintenance assessments, for similar objects and purposes and on substantially the same terms and conditions as those which are set forth herein in this Article IV, except that the commencement date for annual maintenance assessments applicable to such additional subdivisions may be such date (either on, before, or after January 1, 1976), as Developer shall

LAW OFFICES
SWELL & DEAS, P.A.
bb FOLTRESS BUILDING
JACKSONVILLE, FLA.
33994

- 17 -

Dec-19-00  10:04   From-BROAD & CAS...                              +                          T-424  P.21/25  F-062

specify in the recorded restrictions or another instrument
applicable to each such additional subdivision.  In the
event Developer shall subject the lands in any such additional
subdivision to annual maintenance assessments for similar
objects and purposes and on substantially the same terms
and conditions (except for commencement date) as those
which are set forth herein in this Article IV, then, from
and after the commencement date of such annual maintenance
assessments applicable to each such additional subdivision,
it shall not be necessary for the Association to allocate
or apportion the maintenance funds collected by it, or
the expenditures therefrom, between or among East Lake
Woodlands Unit One, and such additional subdivisions, and
said maintenance funds may be collected, commingled, and
expended by the Association without regard to whether they
were collected from assessments on Building Plots in East
Lake Woodlands Unit One, or on building plots in such additional
subdivisions, except, however, that the Paving Reserve
Funds provided for East Lake Woodlands Unit One, in Section
4.02 (a)(3), supra, and similar paving reserve funds established
with respect to and for each and every such additional
subdivision shall not be commingled with each other or
with any other funds.

Section 4.06.  Developer may heretofore or hereafter
plat additional subdivisions as to which it may desire
to subject the lands platted to annual maintenance assessments
substantially different as to object, purpose, or terms
and conditions (other than commencement date) from those
provided in this Article, and to grant to the Association
rights, powers, duties, and obligations with respect to
such substantially different maintenance assessments, and
Developer reserves and shall have the right so to do, but
if Developer shall do so, the provisions of Section 4.05,
supra, shall not apply with respect to the substantially
different maintenance assessments or the subdivisions affected
by same, and such additional subdivisions shall not be
deemed to have been subjected to annual maintenance assessments
pursuant to the provisions of said Section 4.05, supra.

Section 4.07.  The 5-mill maximum amount of the
"annual additional charge" provided for in Section 4.01(b),
supra, and any increase of same effected pursuant to this
Section 4.07, may be increased by the Association from
time to time, with the consent of the persons then owning
75 per cent or more of the Improved Building Plots then
located in East Lake Woodlands Unit One, and any additional
subdivisions of lands which then have been subjected by
Developer to annual maintenance assessments pursuant to
the provisions of Section 4.05, supra.

Section 4.08 - Withdrawal.  Developer shall have
the sole and exclusive right at any time and from time
to time to withdraw from the Association all of the rights,
powers, privileges, and authorities granted it, as contained
in this Article IV, and to transfer and assign all of such
rights, powers, privileges, and authorities to, and to
withdraw the same from, such other person, firm, entity
or corporation as Developer may select.  In the event of
such transfer and assignment, all maintenance funds then
on hand shall be forthwith paid over and delivered to the
transferee or assignee so selected by Developer to be held
for the purposes specified in this Article IV, and such
transferee or assignee, by accepting such funds, shall
assume all obligations of the Association hereunder.

Section 4.09 - Exempt Property.  The following property,
subject to this Declaration, shall be exempted from the
annual maintenance assessment and annual maintenance assessment

LAW OFFICES
COWELL & DEAS, P.A.
420 FLETCHER BUILDING
JACKSONVILLE, FLA.
32202

- 18 -

liens created herein:

      (a)  Access Ways;

      (b)  Utility Parcel.

## ARTICLE V - REMEDIES

*Section 5.01 - Violations.* *Whenever there shall have been built, or there shall exist on any Building Plot, any structure, building, thing, or condition which is in violation of the Covenants, Developer shall have the right, but no obligation, to enter upon the property where such violation exists and summarily to abate and remove the same, all at the expense of the owner of such property, which expense shall be payable by such owner to Developer on demand, and such entry and abatement or removal shall not be deemed a trespass or make Developer liable in anywise to any person, firm, corporation or other entity for any damages on account thereof.*

## ARTICLE VI - MISCELLANEOUS

*Section 6.01 - Approvals.* Wherever in the Covenants the consent or approval of Developer is required to be obtained, no action requiring such consent or approval shall be commenced or undertaken until after a request in writing seeking the same has been submitted to and approved in writing by Developer.  In the event Developer fails to act on any such written request within 60 days after the same has been submitted to Developer as required above, the consent or approval of Developer to the particular action sought in such written request shall be conclusively and irrefutably presumed.  However, no action shall be taken by or on behalf of the person or persons submitting such written request which violates any of the Covenants herein contained.

*Section 6.02 - Assignments.* Developer shall have the sole and exclusive right at any time and from time to time to transfer and assign to, and to withdraw from *such person, firm, or corporation as it shall select,* any or all rights, powers, privileges, authorities, and reservations given to or reserved by Developer by any part or paragraph of the Covenants or under the provisions of the Plat. If at any time hereafter there shall be no person, firm, or corporation entitled to exercise the rights, powers, privileges, authorities, and reservations given to or reserved by Developer under the provisions hereof, the same shall be vested in and be exercised by a committee to be elected or appointed by the owners of a majority of the Lots. *Nothing herein contained, however, shall be construed as conferring any rights, powers, privileges, authorities or reservations in said committee, except in the event aforesaid.  None of the provisions of this Section 6.02 shall apply to or affect the provisions of Article IV, supra.*

*Section 6.03 - Developer's Rights.* Developer reserves and shall have the sole and exclusive right:

      (a)  to amend these Covenants, other than those contained in Article IV, but all such amendments shall be reasonable in nature and shall conform to the general purposes, intent, and standards of the Covenants;

      (b)  to amend these Covenants for the purpose of curing any error or ambiguity in or any inconsistency between the provisions contained herein;

LAW OFFICES
DYKEL & OLAS, P.A.
...FLETCHER BUILDING
JACKSONVILLE, FLA.
32201

- 19 -

(c)  to include in any contract or deed or other instrument hereafter made any additional covenants and restrictions applicable to the Land which do not lower the standards of the Covenants;

(d)  to release any Building Plot from any part of the Covenants which have been violated (including, without limiting the foregoing, violations of building restriction lines and provisions hereof relating thereto) if Developer, in its sole and exclusive judgment, determines such violation to be a minor or insubstantial violation; and

(e)  with the consent of the persons then owning 75 percent or more of the Lots shown on the Plat, to amend or alter the Covenants and any parts thereof in any other respects, except that the provisions of Article IV, supra, may not be amended or altered under the provisions of this section.

Section 6.04 - Additional Covenants.  No property owner, without the prior written approval of Developer, may impose any additional covenants or restrictions on any part of the Land shown on the Plat.

Section 6.05 - Termination.  The Covenants, as amended and added to from time to time as provided for herein, shall, subject to the provisions hereof and unless released as herein provided, be deemed to be covenants running with the title to the Land and shall remain in full force and effect until January 1, 2025, and thereafter the Covenants shall be automatically extended for successive periods of 25 years each, unless within six months prior to January 1, 2025, or within six months preceding the end of any such successive 25 year period, as the case may be, a written agreement executed by the then owners of a majority of the Lots shown on the Plat shall be placed on record in the office of the Clerk of the Circuit Court of Pinellas County, Florida, in which written agreement any of the Covenants provided for herein may be changed, modified, waived, or extinguished in whole or in part as to all or any part of the property then subject thereto, in the manner and to the extent provided in such written agreement. In the event that any such written agreement shall be executed and recorded as provided for above in this Section 6.05, the original Covenants, as therein modified, shall continue in force for successive periods of 25 years each, unless and until further changed, modified, waived, or extinguished in the manner provided in this section.  Notwithstanding the foregoing provisions of this section or any other portion of the Covenants, none of the provisions of Article IV, supra, may be changed, modified, waived or extinguished in whole or in part pursuant to the provisions of this section, unless and until the Access Ways have been dedicated to the public and the maintenance thereof has been assumed and accepted by the County of Pinellas or a municipality or other body politic then having jurisdiction.

Section 6.06 - Enforcement.  If any person, firm, corporation, or other entity shall violate or attempt to violate any of the Covenants, it shall be lawful for Developer or any person or persons owning any Lot:

(a)  To institute and maintain civil proceedings for the recovery of damages against those so violating or attempting to violate any such covenants or restrictions; or

(b)  To institute and maintain a civil proceeding in any court of competent jurisdiction against those so

LAW OFFICES
OWSEL & DEAR, P.A.
do PINELLAS BUILDING
JACKSONVILLE, FLA.
33384

violating or attempting to violate any of the Covenants for the purpose of preventing or enjoining all or any such violations or attempted violations. The remedies contained in this Section 6.06 shall be construed as cumulative of all other remedies now or hereafter provided by law. The failure of Developer, its grantees, successors or assigns, to enforce any Covenant or any other obligation, right, power, privilege, authority or reservation herein contained, however long continued, shall in no event be deemed a waiver of the right to enforce the same thereafter as to the same breach or violation, or as to any other breach or violation thereof occurring prior to or subsequent thereto.

Section 6.07 - Severability. The invalidation of any provision or provisions of the Covenants set forth herein by judgment or court order shall not affect or modify any of the other provisions of the Covenants which shall remain in full force and effect.

Section 6.08 - Notice. All notices to Developer referred to and required herein must either be acknowledged in writing by the receiving party (if verbal) or be given by registered or certified mail (if written). Such notices shall be deemed given for purposes of this Declaration when acknowledged (if verbal) or when postmarked (if written), and written notices shall be deemed validly given for purposes of this Declaration when addressed as follows:

East Lake Woodlands, Ltd.,
Route 3, Box 617(g),
Palm Harbor, Florida 33563.

Section 6.09 - Paragraph Headings. The paragraph headings contained in this Declaration are for reference purposes only and shall not in any way affect the meaning, content or interpretation hereof.

IN WITNESS WHEREOF, Developer, East Lake Woodlands, Ltd., has caused this instrument to be duly executed, all as of the _18th_ day of _August_, 1975.

Signed and sealed in our presence:

_____

_____
As to Allan R. Rutberg

EAST LAKE WOODLANDS, LTD.
a Florida limited partnership

By _____
Allan R. Rutberg, as one of
the two General Partners

By: MUBEN REALTY COMPANY,
a New Jersey corporation,
as one of the two General
Partners

_____
As to Muben Realty
Company

By _____
As its _____
(Corporate Seal)

LAW OFFICES
DWELL & DEAS, P.A.
91 ATLANTIC BUILDING
JACKSONVILLE, FLA.
33204

- 21 -

Dec-18-00  10:50    From-BROAD & CA'                    +                    T-430   P.05/05   F-070

$\varepsilon$ 4330 nol 1005

STATE OF FLORIDA
COUNTY OF DuVAL

    The foregoing instrument was acknowledged before
me this 18TL day of August, 197__, by Allan R.
Rutberg, one of the two General Partners of East Lake Woodlands,
Ltd., a Florida limited partnership, on behalf of the Partner-
ship.

_Euestia Alogue_
Notary Public, State and County
aforesaid, My Commission Expires:

_11/22/76_

STATE OF NEW JERSEY
COUNTY OF ESSEX

    The foregoing instrument was acknowledged before
me this _8th_ day of _August_, 197__, by _J. George_
_Newton_, as _J. Vice President_
of Muben Realty Company, a New Jersey corporation, and
one of the two General Partners of East Lake Woodlands,
Ltd., a Florida limited partnership, on behalf of the corporation
and of the Partnership.

_Walter Roman_
Notary Public, State and County
aforesaid, My Commission Expires:

WALTER A. ROMAN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Mar. 7, 1979

LAW OFFICES
WELL & OTAS, P.A.
* FLETCHER BUILDING
JACKSONVILLE FLA.
32202

- 22 -